# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NEW YORK

_____

ELIZABETH A. JONES,
o/b/o D.X.J.,

                     Plaintiff                  DECISION AND ORDER

-vs-

                                            1:18-CV-0202 CJS

ANDREW M. SAUL,
Commissioner of Social Security,

                     Defendant.

_____

## APPEARANCES

For the Plaintiff:              Amy C. Chambers, Esq.
                              Kenneth R. Hiller, Esq.
                              Law Offices of Kenneth Hiller
                              6000 N. Bailey Avenue, Suite 1A
                              Amherst, New York 14226

For the Defendant:         Padma Ghatage
                              Social Security Administration
                              Office of General Counsel
                              26 Federal Plaza, Room 3904
                              New York, New York 10278

                              Laura R. Boltz
                              Office of General Counsel
                              Social Security Administration
                              1961 Stout Street, Suite 4169
                              Denver, Colorado 80294

## INTRODUCTION

This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final

determination of the Commissioner of Social Security ("Commissioner" or "Defendant"),

which denied the application of Elizabeth Jones for Supplemental Security Income ("SSI") benefits on behalf of her son, DXJ, who was a minor at the time of the application.   Plaintiff alleged that DXJ is disabled due to Attention Deficit Hyperactivity Disorder ("ADHD"), dysthymia and oppositional defiant disorder ("ODD"), but the Commissioner found otherwise.   Now before the Court is Plaintiff's motion (Docket No. [#8]) for judgment on the pleadings and Defendant's cross-motion [#10] for the same relief.   For the reasons discussed below, Plaintiff's motion is denied, Defendant's motion is granted, and this action is dismissed.

STANDARDS OF LAW

42 U.S.C. § 405(g) states, in relevant part, that "[t]he findings of the Commissioner of Social security as to any fact, if supported by substantial evidence, shall be conclusive."   The issue to be determined by this Court is whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard." *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998).   Substantial evidence is defined as "more than a mere scintilla.   It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."   *Id.*

In determining whether a child is entitled to SSI benefits pursuant to 20 C.F.R. 416.924,

> [t]he Commissioner follows a three-step sequential evaluation process to determine whether [the] child is disabled.   At step one, if [the] child is performing substantial gainful activity, the claim is denied.   If not, the Commissioner considers whether the child's impairment is non-severe, a "slight abnormality or a combination of slight abnormalities that causes no

2

more than minimal functional limitations."   If the child's impairment is not severe, the claim is denied.

If the impairment is severe, then the Commissioner considers whether the child has an impairment or a collection of impairments that "meet, medically equal, or functionally equal" any impairment listed in Appendix 1 to 20 C.F.R. Part 404, Subpart P (the "Listings").

*Arsenault v. Colvin*, No. 13–cv–6589 (SAS), 2015 WL 631403 at *6 (S.D.N.Y. Feb. 13, 2015) (citations and footnotes omitted).

In the instant case, Plaintiff does not contend that the child's impairments meet or medically equal a listed impairment, but contends that they "functionally equal" the listings.   In such case,

the Commissioner reviews the evidence to determine how the child's impairments affect h[is] functioning in several broad areas, known as domains.   These domains are: (i) acquiring and using information; (ii) attending and completing tasks; (iii) interacting and relating to others; (iv) moving and manipulating objects; (v) caring for one's self; and (vi) health and physical well-being.   The regulations provide for each age category, and establish a different standard for each age group.

The Commissioner determines within each domain whether the degree of the child's limitation is "marked" or "extreme."   <u>A child is considered disabled if [he] has an extreme limitation in one domain or a marked limitation in two domains.</u>   A "marked" limitation is one that "interferes seriously with [the child's] ability to independently initiate, sustain, or complete activities."   An "extreme" limitation is one that "interferes very seriously with [the child's] ability to independently initiate, sustain, or complete activities."

*Arsenault v. Colvin*, 2015 WL 631403 at *6 (emphasis added; citations and footnotes omitted); *see also*, 20 CFR § 416.924.

3

The instant action involves alleged "functional equivalence" based upon limitations in four domains: acquiring and using information; attending and completing tasks; interacting and relating with others; and caring for self.[1]  The activities within these four domains that are typical of adolescents, as well as examples of limited functioning within these domains, are described in 20 C.F.R. §§ 416.926a(g), (h), (i) and (k), respectively.

For example, with regard to "acquiring and using information," the regulation indicates that adolescents "should be able to comprehend and express simple and complex ideas, using increasingly complex language (vocabulary and grammar) in learning and daily living situations," and should learn "to apply these skills in practical ways that will help [them] enter the workplace after [they] finish school."[2]  Limited functioning in this domain could include "difficulty recalling important things [that were] learned in school [the day before]," "difficulty solving mathematics questions or computing arithmetic answers," speaking "only in short, simple sentences" or having "difficulty explaining what [one] mean[s]."[3]

With regard to "attending and completing tasks," adolescents should "be able to pay attention when [spoken to directly], sustain attention to [their] play and learning activities, and concentrate on activities like putting puzzles together or completing art

---

[1] Plaintiff now maintains that Colton has at least marked impairments in these four domains. Pl. Memo of Law [#12-1] at p. 10.   However, in his pre-hearing memorandum submitted prior to the July hearing, Plaintiff's attorney indicated that DXJ had at least marked limitations in just three domains: attending and completing tasks; interacting and relating with others; and caring for self. Transcript at 257.

[2] 20 C.F.R. § 416.926a(g)(2)(v).

[3] 20 C.F.R. § 416.926a(g)(3).

projects."[4]   Limited functioning in this domain could include "repeatedly [becoming] sidetracked from [activities] or frequently interrupt[ing] others," becoming "easily frustrated and giv[ing] up on tasks, including ones [which the adolescent] is capable of completing," and "requir[ing] extra supervision to keep [the adolescent] engaged in an activity."[5]

With regard to "interacting and relating with others," adolescents should be able to "initiate and develop friendships with children [of their same age]," "relate appropriately to other children and adults both individually and in groups," "be able to solve conflicts between [themselves] and peers or family members or adults outside [their families]," "recognize that there are different social rules for [themselves and their friends] and for acquaintances and adults," "be able to intelligently express [their] feelings," "ask for assistance in getting [their] needs met," "seek information," "describe events," and "tell stories, in all kinds of environments."[6] Limited functioning in this domain could include "hav[ing] difficulty playing games or sports with rules," "hav[ing] difficulty communicating with others," or "hav[ing] difficulty speaking intelligibly or with adequate fluency."[7]

With regard to "caring for yourself," adolescents should be able to "feel more independent from others and [be] increasingly independent in all of [their] day-to-day activities," "begin to discover appropriate ways to express [their] feelings, both good and

---

[4] 20 C.F.R. § 416.926a(h)(2)(v).
[5] 20 C.F.R. § 416.926a(h)(3).
[6] 20 C.F.R. § 416.926a(i)(2)(v).
[7] 20 C.F.R. § 416.926a(i)(3).

bad," and "think seriously about [their] future plans."[8]   Limited functioning in this domain

could include not dressing or bathing appropriately, "engag[ing] in self-injurious

behavior," "ignor[ing] safety rules," "not spontaneously pursu[ing] enjoyable activities or

interests," or "hav[ing] disturbances in eating or sleeping patterns."[9]

## FACTUAL BACKGROUND

The reader is presumed to be familiar with the facts and procedural history of this

action.   The Court will briefly summarize the record as necessary for purposes of this

Decision and Order.

On August 22, 2014, DXJ's mother, Ms. Jones, filed the subject application for

SSI benefits, at which time the child was twelve years of age and about to start Eighth

Grade, in regular education classes.[10]   Ms. Jones indicated that DXJ's disabling

conditions were ADD, asthma and allergies,[11] and that he was taking medications

including Invega for "anger problems" and Concerta for ADD.[12]   Ms. Jones indicated,

as part of the application, that DXJ was easily distracted, had difficulty focusing, and

had" lot of anger problems so he acts on impulse, gets nasty and argumentative."[13]

Ms. Jones further indicated that DXJ did not "get along with authority figures" and had

problems in school, but got along with other people, and had friends his own age.[14]

Ms. Jones stated that DXJ had no limitations on his physical abilities and no problem

---

[8]  20 C.F.R. § 416.926a(k)(2)(v).
[9]  20 C.F.R. § 416.926a(k)(3).
[10]  See, e.g., Transcrit at 189 (Child not in special education).
[11]  Transcript at 163.
[12]  Transcript at 165.
[13]  Transcript at 153.
[14]  Transcript at 155.

taking care of his own personal needs or safety.

Shortly thereafter, three of DXJ's eighth-grade teachers completed "Teacher Questionnaires."[15] DXJ's English teacher reported that the child did not have an unusual degree of absenteeism; that he had no problem acquiring and using information; that he had no problem attending and completing tasks; that he had a "slight problem" in several areas involving interacting and relating with others, but that he usually got back on track after being spoken to about his behavior; that he had no problem moving about and manipulating objects; and that he had no problem caring for himself.

DXJ's math teacher reported that the child did not have an unusual degree of absenteeism; that he had a slight problem in several areas involving acquiring and using information, due to being easily distracted by other students; that he had a slight problem in several areas related to attending and completing tasks, and three obvious problems in that domain, involving waiting to take turns, changing activities without being disruptive, and working without distracting himself or others; that he had a slight problem in several areas relating to interacting and relating with others, and four obvious problems in that domain, involving following rules, using appropriate language, taking turns in conversation and interpreting the meaning of verbal cues; that he had no problem moving about and manipulating objects; and that in the domain of caring for himself, he had a slight problem adjusting to changes in his own mood and an obvious problem being patient.

---

[15] Transcript at 172-189, 192-199, 247-254.

The third teacher, who identified herself as "(Team J Rep) Teacher," indicated that DXJ had a few slight problems in the domain of acquiring and using information, and one obvious problem in that domain, involving his ability to express ideas in written form; that in the domain of attending and completing tasks, he had serious problems related to completing work without making careless mistakes, working without distracting himself or others, and working at a reasonable pace, and a very serious problem with completing homework and assignments; that he had no problems interacting and relating with others or moving about and manipulating objects; and that he had several obvious problems in the domain of caring for himself, which involved handling frustration appropriately, being patient, and using appropriate coping skills. This same teacher commented, "Attendance is a major issue. [DXJ] is absent a lot from school which interferes with academic success."[16]

On December 9, 2014, agency review pediatrician J. Meyer ("Meyer") evaluated the records in support of the application, which at that point consisted of various medical and therapy records, as well as the teacher questionnaire from DXJ's math teacher. Meyer concluded that DXJ had ADHD and asthma, but that he was not disabled. In that regard, Meyer found that DXJ had less-than-marked limitations in the domains of acquiring and using information, attending and completing tasks, caring for himself and health and physical well being, and no limitations in the domain of moving about and manipulating objects.[17] Meyer noted that according to the records, DXJ was easily

---

[16] Transcript at 254.
[17] Transcript at 74-81.

distracted; needed constant reminders to stay on task; and had problems with being patient, expressing anger appropriately, using appropriate language, asking permission, and respecting and obeying adults in authority.

Subsequently, DXJ failed his freshman year of high school (the 2015-2016 school year).   Toward the end of DXJ's freshman year, Ms. Jones requested that he be evaluated for learning disabilities.   On June 1, 2016, school psychologist Deanne Giambra, M.A. ("Giambra"), prepared a psychological evaluation.   Giambra reported that according to Ms. Jones, DXJ's behavior problems began about three years earlier, and may have been connected to the child's father leaving, and/or the child having been diagnosed with ADHD.[18]  Giambra indicated that before testing DXJ, she observed him in the classroom:

> [DXJ] was observed within the classroom while he was in Social Studies.   The class was required to watch a movie and answer written questions about it after. [DXJ] sat in the back of the classroom, and remained in his seat through the observation.   He appeared to be on three cell phones, trying to control each one individually.   He never looked up to watch the movie, or looked at the assignment given by the teacher.   He was completely distracted by his electronics during the entire observation.   He and another student engaged in conversation about what was on the phone.   When asked by his teacher if he had any work finished, he shook his head, and continued with his phones.

Giambra further reported on the results of her testing, summarizing them as follows:

> [DXJ] is a fourteen-year-old ninth grader at Niagara Falls High School who was referred to the Committee on Special Education by his mother as she has concerns regarding [his] academic functioning.   [DXJ] has a probation officer, and is involved in mental health counseling at a community clinic.   He is currently failing all of his classes, and has accumulated suspensions as well as

---

[18]  Transcript at 297.

numerous absences from school.   Health reports indicate a diagnosis of asthma.
Teacher reports indicated [DXJ] has ability, but he chooses not use his skills, and
does not complete any school work or homework.   Observations of [DXJ]
indicate extreme distraction due to electronics usage in class, and noted lack of
effort applied to in-class assignments.   Results of standardized testing indicate
that [DXJ], overall, is functioning within the low average range of cognitive ability,
with average working memory and verbal comprehension skills.   Significant
weaknesses were noted on tasks involving visual search and scanning skills.
Academically, [DXJ] demonstrates average reading and mathematical reasoning
skills, however, his performance was poor when asked to complete mathematical
computations, and writing using appropriate detail, proper grammar and
punctuation.   On a self-report behavior rating scale, [DXJ] rated himself as being
at risk for demonstrating inattention/hyperactivity and attention problems.   All
other areas fell within normal limits.

Transcript at 301.

On July 6, 2016, Plaintiff's mental health therapist, D. Valente, N.P. ("Valente"),

completed a mental residual functional capacity questionnaire.[19] On a check-the-box

form for identifying symptoms, Valente indicated that DXJ had "impairment in impulse

control," "difficulty thinking or concentrating," "persistent disturbance of mood or affect,"

"intense and unstable interpersonal relationships and impulsive and damaging

behavior," and "hyperactivity."   When asked whether DXJ had any behavioral

problems, Valente indicated "problems focusing and concentrating," based on the fact

that he had failed freshman year and reported having problems with focus in school,

and "impairment in impulse control," based on, among other things, the fact that he had

been in verbal altercations with students and staff at school throughout the school year.

Valente also noted that DXJ "at times" reportedly became "loud, defiant and

---

[19]  Transcript at 463-470.

disrespectful toward his mother and school administration."

However, Valente indicated that DXJ did not have a low IQ, a learning disability or reduced intellectual functioning.   Further, when asked to rate DXJ's functional limitations in various domains, she indicated that he had "no limitation" in the domains of "interacting and relating with others" and "moving about and manipulating objects"; "moderate limitation" in the domains of "acquiring and using information" and "caring for self"; and "marked limitation" in the domain of "attending and completing tasks."[20]

On July 11, 2016, a hearing was held before the ALJ. DXJ and his mother both testified at the hearing.[21]

During the July hearing, Plaintiff's attorney informed the ALJ that he was still attempting to obtain two particular groups of records concerning DXJ: 1) disciplinary records from DXJ's school; and 2) records from Niagara County Probation Department. With regard to the latter group, it appears that DXJ and his mother were involved in a probation adjustment program, which is a precursor to the filing of a petition in Family Court for a Person in Need of Supervision ("PINS") under the age of eighteen.[22]   With regard to both groups of records, Plaintiff's counsel told the ALJ that he hoped the records would help demonstrate Plaintiff's impairments in the domains of interacting and relating with others and caring for oneself.   In particular, Counsel indicated that the records would show that DXJ tends to have conflicts with authority figures:

---

[20]  Transcript at 465.

[21]  At a prior hearing on June 13, 2016, Ms. Jones appeared by herself, *pro se*, and indicated that she was unable to get DXJ to accompany her.   The ALJ adjourned the hearing, to allow Ms. Jones an opportunity to retain an attorney, which she did prior to the second hearing.

[22]  See, e.g., Transcript at 49 (Discussing the child's involvement with the Probation Department).

My understanding is that the Claimant has had, and I'm talking specifically about interacting and relating with others . . . that the Claimant has had a lot of difficulty interacting with authority and has affected him in several areas.   But, that he has had direct conflict with authority including teachers, administrators and his own mother.   And I'm hoping that that will all come in and substantiate a finding of marked limitations [in the domain of] interacting and relating with others.   As well as potentially caring for self based on some of his decision making.

Transcript at 41-42.   Plaintiff's attorney indicated that the Probation Department had acknowledged his request for records, and that he was hopeful that he would receive the records "pretty quickly."[23]

The ALJ responded that the records already in his possession contained many references to DXJ having conflicts with school authorities, but that they did not indicate that he had at least a marked impairment in the domain of interacting and relating with others.   In particular, the ALJ referenced Exhibit 12F, the report from Nurse Practitioner Valente, which referred to DXJS's repeated conflicts with his mother and with school authorities, but which also indicated that Plaintiff had "no limitation" in interacting and relating with others, and only a "moderate limitation" in caring for himself.[24]

During the hearing, the ALJ frankly pointed out to Plaintiff's attorney that the evidence in the record at that time, including the report from NP Valente, did not appear to support a finding that DXJ had marked impairments in at least two domains. Plaintiff's counsel admitted that was true, but, again, indicated his hope that the Probation Records, once obtained, would help establish functional equivalence.

DXJ's mother, Ms. Jones, testified that the child was disrespectful and

---

[23] Transcript at 40.
[24] Transcript at 42, 465.

disobedient toward her, that he refused to get out of bed and go to school, that she needed to remind him to take care of his personal hygiene, that she received weekly calls from school about problems with him, that he had been suspended several times and been sent to alternative educational locations, and that he fought with his older brother.   Ms. Jones indicated that DXJ's focus and concentration were not good, that he was easily distracted, that he could not sit still, and that his doctors had recently changed his medications because they felt that his prior medications were not helping. Ms. Jones stated that DXJ would have to repeat ninth grade, because he had failed all of his classes, and that he was refusing to attend summer school. She further stated that at school, DXJ would often leave the classroom without permission and either walk the halls or hide in the bathroom.   Ms. Jones noted, however, that DXJ's hobby was baseball, and that he played pitcher and catcher on a travel league baseball team, and that he had no problems with his teammates or his coaches.

Regarding DXJ's involvement with Niagara County Probation, Ms. Jones indicated that she had initiated such involvement "to have some assistance," due to the child's unwillingness to obey her.[25]   As for the actual program at Probation, Ms Jones testified:

Q. Okay.   What does the probation program do [for] him?

A. We usually go every two weeks and basically they told him he had to get it together or they going to go through the courts.   And, you know, possibly talk about removing him if he can't get it together –

Q. Okay.

---

[25] Transcript at 44.

A. Because he's draining me.   I have a three year old in the house and I have, you know, an 18 year old in the house.   And we just keep going on like this.   I mean, every day is a struggle, an argument, everything's difficult with him.   He's just very nasty.   Very nasty.   You know, I have to tell him to do everything, brush your teeth, wash your hair, get up and clean up after yourself, do chores, I mean, he doesn't want to do anything.

Transcript at 48-49.   Ms. Jones further testified:

Q. You said that he, that the probation department is involved.   He goes there every couple of weeks and they tell him he better shape up or else he could end up being removed?

A. Yes.

Q. And how many times have they told him that?

A. Well because since we've started going, he's just been getting worse.   The probation officer has not seen any improvements.   And then when [DXJ] got suspended twice and they were talking about paroling [throwing?] him out of the school, you know, [the probation officer] he said you're not even, you know, try[ing] to meet us even a quarter of the way here[.]

Transcript at 53.

DXJ also testified, articulately, and agreed that he frequently missed school, even though his mother attempted to make him go, because he chose to wake up late and stay home. DXJ indicated that he "sometimes" had conflicts with teachers and administrators, and that he got into trouble for insubordination, but suggested that it often involved him getting angry at the way people spoke to him.[26]   DXJ stated that he had been suspended twice during the recently-completed school year.   DXJ indicated

---

[26] *See*, Transcript at 57 ("I do get disrespectful because of the way they talk to me.").

that he generally got along with his classmates, and that it had been years since he had gotten into a physical altercation with another student. DXJ stated that he enjoyed playing baseball and got along well with his teammates and coaches. He further stated that he enjoyed fishing on the days when he skipped school (sometimes with his cousin), and that he enjoyed working with his hands, and was considering pursuing carpentry as a career. Additionally, DXJ stated that he intended to graduate from high school.[27] DXJ agreed that he generally found it easier to focus on activities and things that he found interesting. After listening to DXJ's testimony, the ALJ remarked that DXJ "seem[ed] like an incredibly smart kid," to which Ms. Jones responded, "Thank you."[28]

At the close of the hearing, the ALJ told Plaintiff's attorney that he would be awaiting the additional documentation that counsel was attempting to obtain. *See*, Transcript at 63 ("ALJ: Okay. I will look for that additional information. We can get a clearer picture – ATTY: Thank you, Your Honor.").[29]

Subsequently, on August 9, 2016, Plaintiff's counsel wrote to the Office of Disability Adjudication and Review to request the issuance of a subpoena, to Niagara County Probation. In that regard, Plaintiff's counsel indicated that he had already contacted that office five times, requesting whatever records they had.

On December 13, 2016, the ALJ issued his decision, denying Plaintiff's

---

[27] Transcript at 60 ("I want to graduate.").
[28] Transcript at 63. DXJ's mental health therapist agreed that he is "bright," and needs to "increase [his] academic performance." Transcript at 422 ("Client is bright.").
[29] Transcript at 40, 256. Again, counsel indicated that he was awaiting records from Niagara Falls High School and from Niagara County Probation.

application.   The ALJ began his decision by noting that he was denying Plaintiff's request for a subpoena because she had not complied with the procedural requirements for such a request.[30]   The ALJ further indicated that the documents which Plaintiff wanted to subpoena (the records from Niagara County Probation) were "not reasonably necessary for the full presentation of the case."[31]   The ALJ then went on to find, in pertinent part, that Plaintiff was not disabled because his impairments did not meet, medically equal or functionally equal a listed impairment.

With regard to functional equivalence, the ALJ found that Plaintiff had no limitation in the domain of moving about and manipulating objects, and a less-than-marked limitation in the other five domains.   In explaining this finding, the ALJ reviewed and summarized the evidence, and found, first, that while DXJ indeed had problems with school, his "excessive absences and tardiness [were a] significant cause of th[o]se difficulties." In that regard, the ALJ noted that "intelligence testing corroborates this conclusion."   Additionally, the ALJ stated that while AXJ had certainly demonstrated a variety of behavior problems, the record established that he could focus and exercise self control when it suited him to do so, such as when he was playing baseball.   The ALJ also noted that according to the school psychologist, AXJ had been "polite, respectful, cooperative and well-engaged during the intelligence testing."

With regard to the various opinion evidence, the ALJ gave significant weight to most of Valente's opinion, but less weight to the portion of her opinion in which she

---

[30]  Plaintiff does not dispute that.
[31]  Transcript at 16.

indicated that DXJ had a marked restriction with regard to attending and completing tasks, due to the fact, as already discussed, that Plaintiff's academic difficulties were primarily the result of his absenteeism.   The ALJ gave significant weight to the entire opinion of Dr. Meyer, finding that it was "generally consistent with the overall evidence of record."   The ALJ gave some weight to the opinions of DXJ's three teachers, even though they were not acceptable medical sources, since their opinions were generally consistent with the opinions of Valente and Meyer.   Based upon these findings, the ALJ concluded that DXJ was not disabled.

Plaintiff appealed, but on December 6, 2017, the Appeals Council declined to review the ALJ's decision.

On February 5, 2018, Plaintiff commenced this action.   On September 4, 2018, Plaintiff filed the subject motion [#8] for judgment on the pleadings.   In support of that motion, Plaintiff contends that the Commissioner's decision must be reversed for the following reasons: 1) the ALJ's functional equivalence findings are not supported by substantial evidence; 2) the ALJ failed to develop the record by obtaining records from Niagara County Probation; 3) the ALJ failed to properly evaluate the opinion evidence; 4) the ALJ failed to evaluate the credibility of DXJ's mother, Ms. Jones.

On November 2, 2018, Defendant filed the subject cross-motion [#10] for judgment on the pleadings.

DISCUSSION

The Court has reviewed the administrative transcript and the parties' submissions, and concludes that Plaintiff's arguments lack merit.

17

At the outset, the Court finds that the ALJ did not violate his well-established duty to develop the record when he denied Plaintiff's request to subpoena records from Niagara County Probation.[32]   On this point,

> [i]t is the rule in the Second Circuit that the ALJ, unlike a judge in a trial, must himself affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding.   An ALJ is not required to request records that contain duplicative information.   Instead, the duty to further develop the record is triggered when inconsistencies or inadequacies necessitate further information.

*Rivera v. Colvin*, No. 15-CV-50S, 2016 WL 6155575, at *3 (W.D.N.Y. Oct. 24, 2016).

As mentioned earlier, during the hearing before the ALJ, Plaintiff's counsel indicated that he was attempting to obtain the records from Niagara County Probation as evidence that DXJ had at least a marked impairment in the domain of interacting and relating with others.   In particular, Counsel indicated that the records would show that DXJ tends to have conflicts with authority figures.[33]   Ms. Jones also testified concerning the visits that she and DXJ had with Probation, and indicated that she related to Probation essentially the same information that she was relating to the ALJ, namely, that she DXJ's behavior was terrible and that she could not control him.   There is no indication in the record that Probation conducted any type of testing or evaluation of DXJ.   Rather, according to Ms. Jones's testimony, individuals at Probation merely attempted to talk DXJ into improving his behavior, by warning him that he might be removed from school unless his behavior improved.[34]

---

[32] Plaintiff's motion suggests that the ALJ also somehow failed to develop the record with regard to educational records, but that argument is not fleshed out, and the Court disagrees in any event.
[33] Transcript at 41-42.
[34] Transcript at 44, 48-49, 53.

The ALJ indicated that the Probation records were "not reasonably necessary for the full presentation of the case," and the Court finds that determination is supported by substantial evidence. The Probation records would have been merely cumulative, since the record is already replete with instances of DXJ misbehaving toward authority figures at various times. For example, school records indicate that on May 3, 2016, *a teacher* made this report concerning DXJ: "[DXJ] was not supposed to be in here due to earlier discipline infractions. I asked him to leave, his response, "You're a pretty ass little kid."[35] It is hard to imagine that the Probation Records could more clearly demonstrate DXJ's willingness at times to act disgracefully toward authority figures. Plaintiff has not offered any reason to believe that the Probation Department records will add anything new to the record. In sum, Plaintiff's contention that the ALJ failed to develop the record lacks merit.[36]

The Court also finds that the ALJ's functional equivalence findings are supported by substantial evidence, contrary to what Plaintiff maintains. *See, e.g., Grant v. Colvin*, No. 12-CV-962 MAT, 2015 WL 3746707, at *6 (W.D.N.Y. June 15, 2015) (ALJ's finding, that claimant had less-than-marked impairment in domain of acquiring and using information, was supported by substantial evidence, where "Plaintiff's negative academic achievement was mostly attributed to her high level of absenteeism."); *Briggs v. Colvin*, No. 7:15-CV-0071 (GTS), 2016 WL 344973, at *11 (N.D.N.Y. Jan. 27, 2016)

---

[35] Transcript at 294.

[36] The Court is aware that this case bears some superficial resemblance to another case from this district, in which the Court found that the ALJ had violated his duty to develop the record. *See, Will o/b/o C.M.K. v. Commissioner of Social Security*, 366 F.Supp.3d 419, 424-428 (W.D.N.Y. 2019). However, the two cases are factually inapposite.

("Although D.H. further admitted to having fought with his brothers (and the incident on the school bus involved one of his brothers), the regulations do not suggest that any child who does not get along with his older brothers also has a marked limitation in this domain [(Interacting and relating with others)]."); *Sepulveda ex rel. A.S. v. Colvin*, 964 F. Supp. 2d 228, 236 (N.D.N.Y. 2013) ("Although there are a few instances where it is noted that plaintiff could be defiant and disrespectful, substantial evidence in the record supports the ALJ's conclusion that she has less than marked limitations in interacting and relating with others."); *Jeffrey A. on behalf of J.M.A. v. Saul*, No. 5:18-CV-195 (CFH), 2019 WL 3081092, at *11 (N.D.N.Y. July 15, 2019) ("[S]ubstantial evidence supports the ALJ's determination that J.M.A. had a less than marked limitation in the domain of interacting and relating to others. The Court acknowledges that evidence exists in the record demonstrating that J.M.A. had limitations in this domain; however, in assessing the entire record, the Court finds that it is not enough to overcome this highly deferential standard.").   Further the Court finds that the ALJ properly evaluated the opinion evidence and gave good reasons for the weight that he assigned to the various opinions.

As for Plaintiff's contention that the ALJ erred by failing to specifically indicate whether he found Ms. Jones to be a credible witness, the Court disagrees.   Plaintiff's argument on this point appears to rest on the premise that because the ALJ found DXJ not disabled, he must have found that Ms. Jones was not credible. *See, e.g.*, Pl. Memo of Law [#8-1] at p. 29 ("The ALJ provided no cogent link between the evidence, and what he specifically found to contradict [DXJ's] mother's testimony across the remaining

domains."). However, the ALJ's decision does not indicate that he found that Ms. Jones was not credible. On this point, Ms. Jones primarily testified that DXJ was disrespectful and disobedient toward her, that he did not get along with his older brother, that he frequently got into trouble at school, and that he was performing poorly academically. However, as to her testimony, the ALJ noted that other evidence, particularly school records, also documented these same behaviors.[37] The ALJ pointed out, though, that despite such evidence, there was other substantial evidence that DXJ was able to control himself and be respectful and compliant when he chose to do so, such as when playing baseball or when taking his psychological examination.[38] For example, the ALJ observed that DXJ "has the ability to exercise some self-control in a social context when the activity interests him."[39] In any event, the Court does not agree that the ALJ was required to expressly indicate whether or not he found Ms. Jones credible. The ALJ indicated that he considered Ms. Jones's testimony,[40] and his decision as a whole indicates that he accepted her testimony, but found that such testimony did not establish that DXJ is disabled in light of the overall record.[41] That determination is supported by substantial evidence.

The Court has considered all of Plaintiff's remaining arguments and finds that

---

[37] *See*, Transcript at 22 ("[T]he school incident reports noted fifteen incidents between September 18, 2014 and May 17, 2016. Many of these incidents involved insubordination, including walking the halls, being disruptive, using inappropriate language, or failing to listen to teachers' instructions.").

[38] Transcript at 23; *see also, id.* at 24 ("[T]he intelligence testing administered by the school psychologist on May 31, 2016 revealed his ability to demonstrate cooperative demeanor, engaged, polite, respectful, [sic] as well as working in a 'business-like fashion' on the testing items.").

[39] Transcript at 28.

[40] Transcript at 20, 21, 22.

[41] *See, e.g.*, Transcript at p. 30, ¶ 2 (Noting Ms. Jones's statements, but also noting other evidence tending to establish a less-than-marked limitation overall).

they also lack merit.

CONCLUSION

Plaintiff's application [#8] is denied, defendant's application [#10] is granted, and this action is dismissed.   The Clerk of the Court is directed to enter judgment for defendant and close this action.

So Ordered.

Dated: Rochester, New York
     September 30, 2019

ENTER:


/s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge